# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ERIC D. CONNER,

     **Plaintiff,**

  v.          Case No. 17-CV-1388

SCOTT RUBIN-ASCH, JOSEPH DRESEN
JOHN SHARPE, NATHANIEL GILMAN,
MATTHEW OSWALD, ZACHARY BERGER,
GARY TROSTORFF, JASON GODFREY,
STEVEN MEYER, and JARED HUNT,

     **Defendants.**

## ORDER

Plaintiff Eric D. Conner is representing himself and at the time of the events in question was incarcerated at Wisconsin Secure Program Facility (WSPF). Conner is proceeding on an Eighth Amendment deliberate indifference claim based on his allegations that defendants did not prevent him from attempting suicide and on a First Amendment retaliation claim. ECF No. 16. The parties filed cross-motions for summary judgment. ECF Nos. 24 and 47. Conner also filed a motion for spoliation sanctions, ECF No. 28, and a motion for leave to file a sur-reply. ECF No. 70. Those motions are fully briefed and ready for the court's decision. For the reasons that follow, the court denies Conner's motion for summary judgment and grants defendants' motion for summary judgment. The court also denies Conner's motion for spoliation sanctions and motion for leave to file a sur-reply.

## I. Background[1]

### A.     Parties

During the events in question, Conner was an inmate at WSPF. ECF No. 57 at ¶ 1. Defendant Dr. Scott Rubin-Asch was a Psychologist Supervisor at WSFP. *Id.* at ¶ 3. All the remaining defendants are correctional officers of various ranks at WSPF. *Id.* at ¶¶ 5-12.

### B.     Conner's history of mental health and threats of self-harm

Conner was incarcerated at Waupun Correctional Institution from 2010 to 2016. ECF No. 57 at ¶ 2. While at Waupun, it is undisputed that Conner "had a history of 'making threats to security to obtain single cell,' 'requesting transfer to WSPF for secondary gain of single cell,' and 'refusing to cooperate with Psychological Services Unit (PSU) staff for treatment.'" ECF No. 67 at ¶ 15. Conner also threatened to starve himself to death or overdose on medication while incarcerated at Waupun. ECF No. 57 at ¶ 16.

In September 2016, Conner was transferred to WSPF. *Id.* at ¶ 17. During the transfer, WSPF staff noted that Conner had been diagnosed with post-traumatic stress disorder/nightmare disorder and anti-social personality disorder. *Id.* at ¶ 18. Conner was placed on administrative confinement at WSPF. *Id.* at ¶ 19. He complained to WSPF's PSU about the placement and asked them to intervene,

---

[1] The court takes the relevant facts primarily from Defendants Proposed Findings of Fact, ECF No. 57, Defendant's Response to Plaintiff's Proposed Findings of Fact, ECF No. 58, and Plaintiff's Response to Defendants' Proposed Findings of Fact, ECF No. 67.

threatening to kill himself if he wasn't moved. *Id.* at ¶¶ 19-20. He also asked to be transferred to the Wisconsin Resource Center (WRC). *Id.* at ¶ 21. It is unclear from the record what, if anything, PSU did with Conner's complaint about administrative confinement.

Then, on February 13, 2017, it is undisputed that Conner tied a bed sheet around his neck and the showerhead in his cell, apparently attempting to hang himself. ECF No. 67 at ¶ 32. Conner's feet never left the ground during this attempt. *Id.* at ¶ 33. He also did not lose consciousness and does not remember being treated for any injuries. *Id.* However, this incident caused PSU to place him on observation status. *Id.* at ¶ 34.

While on observation status between February 13 and March 2, Conner refused to cooperate with PSU staff during evaluations. *Id.* at ¶¶ 34-35. At most, Conner would request a transfer to WRC. *Id.* at ¶ 35. Conner finally met with Dr. Hoem (not a defendant in this suit) on March 2, and he told Dr. Hoem he was not having thoughts of self-harm. *Id.* at ¶ 36. He was released from observation status that same day. *Id.*

The next day, while Conner was in the recreation yard, he climbed to the top of the gate and tied a towel or a sheet to the gate with the intention to tie the other end around his neck. ECF No. 67 at ¶ 37. However, Conner says he changed his mind and jumped down. *Id.* PSU staff then placed him back into observation status. *Id.* at ¶ 38.

A few days later, on March 7, Conner again attempted self-harm. ECF No. 67 at ¶ 41. The parties dispute the seriousness of the harm. Defendants characterize the incident as Conner jumping off his toilet once and hitting his head on his cell window. ECF No. 57 at ¶ 41. Conner states that he was repeatedly diving off his sink head-first into a "big window" and was choking himself with his security smock. ECF No. 58 at ¶ 19; ECF No. 67 at ¶ 41. It is undisputed that Conner voluntarily removed the smock around his neck after security staff threatened to use incapacitating agents. ECF No. 67 at ¶¶ 44-45. He did not lose consciousness or suffer physical injury other than some redness on his head. ECF No. 58 at ¶ 19; ECF No. 57 at ¶ 42. Neither party disputes that Conner was put into bed restraints as a result. ECF No. 58 at ¶ 19.

Between March 3 and March 20, Conner refused to cooperate with PSU's attempts to evaluate him. ECF No. 67 at ¶ 48. Then, on March 20,[2] Conner placed a plastic food bag over his head. ECF No. 58 at ¶ 18. Defendants state that Conner voluntarily removed the bag. ECF No. 57 at ¶ 50. Conner states that he was taking the bag on and off at the direction of "John." ECF No. 67 at ¶ 50. According to PSU staff, "John" is a manifestation of Conner's guilt taking the form of his murder victim. ECF No. 57 at ¶ 22. In the opinion of PSU staff, "John" is not a sign of significant mental illness. *Id*. It is undisputed that Conner suffered no injuries from this incident. ECF No. 67 at ¶ 51.

---

[2] Defendants' proposed findings of fact state this date as March 22, but then they do not dispute the date in their response to Plaintiff's proposed findings of fact. The relevant exhibit (ECF No. 26 at Exh. #41) supports the March 20 date.

On March 27, Conner again threatened to choke himself with his security smock, but the smock was taken from him, and he did not actually engage in self-harm. ECF No. 58 at ¶ 17; ECF No. 67 at ¶ 52. On March 29, a hearing was held regarding Conner's observation status. ECF No. 57 at ¶ 53. The hearing included A. Mink, a physiological associate; Security Director Kartman; and Dr. Hoem. ECF-60-1 at Exh. 1002-039. Conner refused to participate. ECF No. 67 at ¶ 53; *See also* ECF-60-1 at Exh. 1002-039. At the hearing, it was determined that because Conner did not participate, "his risk of self-harm could not be assessed." *Id.* As a result, it was decided that Conner would "remain in observation status to help reduce his risk of self-harm and so staff can continue to closely monitor his behavior." *Id.*

On April 4, Conner again made threats to choke himself with his smock and defendant Hunt took it from him. ECF No. 58 at ¶ 15. That same day, Conner also submitted a health services request to Dr. Rubin-Asch requesting personal items, including a blanket and medicated lotion for dry skin, and requesting that he be transferred to WRC. ECF No. 67 at ¶ 55; ECF No. 60-1 at Exh 1002-180. Conner also stated that "being held in PSU" was "a form of punishment" because he believed he was being denied the blankets and lotion for refusing to cooperate with PSU staff. *Id.* at ¶ 56 ECF No. 60-1 at Exh 1002-181. It is unclear from the record whether Conner made the threat to choke himself with the smock before or after he submitted the health services request.

Conner had an appointment on April 7 for a "medication check" conducted by a psychiatrist not on staff at WSPF. ECF No. 57 at ¶ 58. He refused to attend the

appointment because he believed it to be a "planned attack to try and get [him] to start talking with PSU staff." *Id.* On April 13,[3] Dr. Rubin-Asch and Dr. Tom again attempted to evaluate Conner. ECF No. 67 at ¶ 59; ECF No. 60-1 at Exh. 1002-23. Conner again refused to cooperate with them. *Id.* Dr. Tom noted in his report that Conner should "remain in clinical observation status to ensure his safety as he appears to still be at high-risk for self-harm." *Id.* Dr. Tom also mentioned Conner's "documented history of being hospitalized after his suicide attempt at the county jail," and surmised that Conner may be "utilizing clinical observation status as a way to manipulate a transfer." *Id.* Dr. Tom ultimately concluded that because Conner "refuses to communicate his needs" he "will need to remain in clinical observation status at this time." *Id.* PSU staff again tried to evaluate Conner on April 14, April 17, and April 18, but Conner refused to cooperate. ECF No. 67 at ¶¶ 60-61.

### C. The Events of April 20, 2017

On the morning of April 20, A. Mink attempted another evaluation of Conner, but Conner refused to participate. ECF No. 67 at ¶ 62. Mink determined that because Conner could not be evaluated, he needed to remain in observation status. *Id.*; ECF No. 26-1 at Exh. 33. Then, around 2:30 PM, Dr. Rubin-Asch attempted to speak with Conner, but Conner refused to answer. ECF No. 67 at ¶ 63.

After this attempt, Dr. Rubin-Asch decided to remove Conner from observation status. *Id.* at ¶ 64. Specifically, in his report, Dr. Rubin-Asch states that he told

---

[3] Defendants state this date as April14, but both plaintiff's response and the relevant exhibit (ECF No. 60-1 at Exh. 1002-0023) state April 13.

Conner he would be removing him from clinical observation, noting he had "no current indications of suicidal ideation." ECF No. 26-1 at Exh. 34. Dr. Rubin-Asch further notes that five minutes after this conversation, Conner told Alpha Unit security staff that he was having suicidal thoughts. *Id.* Specifically, it is undisputed that Conner told Officer Godfrey that he did not want to come off observation status, and if he was taken off observation status, he would engage in attempts of self-harm. ECF No. 67 at ¶ 66.

Dr. Rubin-Asch attempted to talk with Conner again after this threat, specifically asking him to identify to him—"the individual responsible for determining his risk of self-harm"—any suicidal thoughts he might be having. ECF No. 26-1 at Exh. 34 Conner, once again, refused. *Id.* Dr. Rubin-Asch then repeated to Conner his decision to remove him from clinical observation status "in the hope that this would enable the actual provision of meaningful behavioral health treatment." *Id.* In his report, Dr. Rubin-Asch stated his reasoning for removing Conner from observation status as follows:

> Mr. Conner is refusing to communicate with PSU staff and has not demonstrated or reported suicidal ideation to PSU staff for several days. In order to facilitate enhanced communication with Mr. Conner for the purpose of improving the likelihood that his mental health concerns can be effectively evaluated and ultimately addressed by PSU staff, he is being removed from clinical observation status and will be provided with follow-up contact with PSU staff accordingly.

*Id.* Dr. Rubin-Asch states that it was his professional opinion was that Conner's threats of self-harm "were not serious and were motivated solely to obtain secondary

gain, including remaining in observation." ECF No. 57 at ¶ 67. Dr. Rubin-Asch came to this conclusion after several weeks of monitoring Conner. *Id.* at ¶ 68.

Conner was released from observation status at 2:55 PM. ECF No. 26-1 at Exh. 34. Dr. Rubin-Asch did not place any clothing restrictions on Conner, and Conner received segregation clothes instead of a suicide smock. ECF. No. 67 at ¶ 75.

Captain Sharpe was then notified by PSU staff that Conner was released from observation but was refusing to be removed from his cell. ECF No. 67 at ¶ 71. Sharpe assembled a cell-extraction team that included defendants Meyer, Hunt, Oswald, Gilman, and Berger. *Id.* at ¶ 72. During the extraction, Conner states that he made repeated threats of self-harm, including statements to Sharpe and Dresden, but the defendants deny this. *Id.* at ¶ 74; ECF No. 58 at ¶ 8. However, it is undisputed that Conner stated "I'll show you" to the defendant security officers during the cell-extraction. ECF No. 58 at ¶ 13.

Regardless of the nature of Conner's threats, defendants state that the security officers had no authority to override Dr. Rubin-Asch's decision to remove Conner from observation status. ECF No. 57 at ¶ 70. Defendants state that corrections officers can only place an inmate on observation status when the Warden and PSU staff are not immediately available and the placement is necessary to ensure the safety of the inmate. *Id.* at ¶ 28. Conner disputes this, stating that an inmate can refer himself to observation status. ECF No. 67 at ¶ 27. A review of Wisconsin Department of Adult Institutions (DAI) Policy 500.70.24 (I) indicates while an inmate may recommend himself for observation status, the individuals who have authority to actually place

the inmate in observation status are Psychologist Supervisors, Psychologists-Licensed, Psychological Associates, Crisis Intervention Workers, Physicians, and Wardens. *See* ECF No. 59-2.

Conner was placed into a segregation cell, and according to Conner, Sharpe ordered Officer Duve (not a defendant) to remove Conner's bed linen. ECF No. 58 at ¶ 45. Sharpe does not recall whether he ordered this. *Id.* Conner was also yelling to the guards placed outside his cell, including defendant Trostoff, that he was suicidal. ECF No. 1 at ¶ 19.

Then around 8:00 PM that night, Conner tied his clothes to the showerhead. ECF No. 67 at ¶ 77. He placed a large pillow on the floor under the showerhead, kneeled down, and tied the clothes around his neck. *Id.* at ¶¶ 78-79. Then a minute later, he voluntarily removed the clothing, walked to his cell door, and either him or "John" spoke to the officer stationed outside the door. *Id.* at ¶¶ 80-82. At this point, Conner voluntarily agreed to be handcuffed and the guards returned him to observation status. *Id.*at ¶¶ 83-84. Conner did not suffer a physical injury, nor did he request to go to Health Services Unit as a result of this incident. *Id.* at ¶¶ 85-86. Conner states that during this incident, he was not trying to kill himself but believes that "John" wanted him to die. *Id.* at ¶ 87. Dr. Rubin-Asch states that because Conner was not cooperating or communicating with PSU, he was unaware of "John" on April 20, 2017. *Id.* at ¶ 88.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A moving party "is entitled to judgment as a matter of law" where "the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Still, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Id.* (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d

725, 730 (7th Cir. 2013) (quoting *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [his] favor." *Fitzgerald*, 707 F.3d at 730 (quoting *Makowski v. SmithAmundsen LLC*, 662 F.3d 818, 822 (7th Cir. 2011)).

## III.    Motion for sur-reply

Conner has filed a motion seeking leave to file a sur-reply to the defendants' reply brief. ECF No. 70. He acted in accordance with Civil Local Rule 7(i) and filed his proposed brief simultaneously with his motion. "The decision to permit the filing of a sur-reply is purely discretionary and should generally be allowed only for valid reasons, such as when the movant raises new arguments in a reply brief." *Merax-Camacho v. United States*, 417 F. Appx. 558, 559 (7th Cir. 2011). Here, defendants did not raise new arguments, and Conner's sur-reply contains no new information. His motion to file a sur-reply is denied.

## IV.    Analysis

### A.    Eighth Amendment deliberate indifference claim

Under the Eighth Amendment, "prison officials have a duty to 'ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Estate of Miller, ex rel. Bertram v. Tobiasz*, 608 F.2d 984, 989 (7th Cir. 2012) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). The court considers both an objective and subjective element to determine if a prison official failed that duty and violated an inmate's Eighth Amendment rights. *Id.* The inmate must have suffered "a

deprivation" that is "objectively, sufficiently serious." *Sanville v. McCaughtry*, 266 F.3d 724, 733 (7th Cir. 2001). Also, "the mental state of the prison official must have been 'one of deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 832.)

### 1. Objectively serious harm

The Seventh Circuit has consistently held that "suicide is a serious harm." *Estate of Miller*, 608 F.3d at 989. "It would be difficult to think of a more serious deprivation than to be deprived of life, and thus [it] satisfies the first element." *Sanville*, 266 F.3d at 733; *see also, Estate of Novak ex rel. Turbin v. Cty of Wood*, 226 F.3d 525, 529 (7th Cir. 2000); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). There are two aspects of a suicide attempt—the self-harm aspect and the suicidal ideation aspect. *Collins v. Seeman*, 462 F.3d 757, 760-761 (7th Cir. 2006); *see also Jones v. Menning*, No. 17-cv-1316, 2018 WL 28600045, * 2 (E.D. Wis. June 6, 2018).

However, the Seventh Circuit has yet to fully tackle the question of insincere suicide attempts or attempts that are superficial in nature, especially where the inmate appears to be trying to manipulate prison officials to gain some sort of privilege, advantage, or change in circumstance. In the last two years, there have been two cases from the Eastern and Western Districts of Wisconsin that have explored these kind of attempts. In *Davis v. Gee*, No.14-cv-617, 2017 WL 2880868, *6 (W.D. Wis. July 7, 2017), the court found that plaintiff did not suffer any objective risk of serious harm where he took a handful of pills that turned out to be a non-toxic

amount of Tylenol. The plaintiff showed the security guard a handful of pills, said he was feeling suicidal, and asked to be placed on observation status. *Id.* at *1. The guard ignored the plaintiff, who took the pills, and then was taken to the emergency room. *Id.* Because the plaintiff suffered no pain, sustained no significant symptoms, and required no treatment, the court found that his suicide attempt did not rise to level of "objectively serious." *Id.* at *6.

In *Jones v. Menning*, No. 17-cv-1316, 2018 WL 28600045, * 2 (E.D. Wis. June 6, 2018), the court found that plaintiff's self-harm and purported suicidal ideations did "not rise to the level of an objectively serious medical condition." Regarding plaintiff's self-harm, the court found the attempts were not objectively serious because the plaintiff used tiny pieces of metal over the course of six days to create "exceedingly minor wounds." *Id.* Most of the wounds did not bleed, and some attempts did not break the skin. *Id.* The only treatment required was a bandage and disinfectant. *Id.* Regarding the purported suicidal ideations, the court determined they were not objectively serious because the plaintiff had "a record of cutting himself to achieve secondary gain—to get prison staff to move him or give him some other form of special treatment." *Id.* The plaintiff in this case also admitted that his goal was not suicide but to be moved to a quiet place. *Id.*

Conner's suicide attempt on April 20, 2017, is similar to the attempts in *Davis* and *Jones*. Conner appears to have gone through the motions of an attempted hanging—tying his clothes to the showerhead and around his neck, kneeling on a pillow—but there is no record evidence that the attempt was serious. ECF No. 67 at

¶¶ 77-79. In fact, even when taking the facts in the light most favorable to Conner, the record demonstrates that the self-harm Conner engaged in was superficial at best. He got up after a minute, voluntarily removed his make-shift noose, and began talking to the officer at the door. *Id.* at ¶¶ 80-82. By his own admission, Conner suffered no injuries and required no medical attention. *Id.* at ¶¶ 85-86.

Conner's suicidal ideation on April 20 is also similar to the plaintiff's suicidal ideation in *Jones* in that Conner explicitly stated he was threatening suicide to stay on observation status—a secondary gain, in his view. It is undisputed that Conner clearly stated to Godfrey that if they removed him from observation status, he would harm himself. *Id.* at ¶ 67. And, in Conner's version of the facts, he states he told Sharpe, Dresden, and Dr. Rubin-Asch during the extraction that he was going to attempt suicide if he was not placed back in observation. *Id.* at ¶ 74. He also told Trostoff the same thing after the extraction was completed. ECF No. 1 at ¶ 19.

Also like the plaintiff in *Jones*, Conner has a history of making superficial suicide attempts to get what he wants. His record from Waupun noted that he had a history of making threats to obtain a single cell or a transfer. ECF No. 67 at ¶ 15. Then, after he was transferred to WSPF, he had six "suicide attempts" between February 13, 2017, to April 19, 2017, where he suffered no significant injury. The worst "injury" he sustained was some redness on his head that required no treatment. ECF NO. 58 at ¶19; ECF No. 57 at ¶ 42. Several of these attempts also appear to be motivated to get a transfer to WRC. There were a few attempts that appear to be

motivated by "John", but PSU staff determined that Conner's manifestation of "John" was not a significant sign of mental illness. ECF No. 57 at ¶ 22.

As such, it does not appear that Conner's suicide attempt on April 20, 2017 was an objectively serious condition; particularly in light of *Davis* and *Jones*. Nevertheless, the court will consider whether defendants were deliberately indifferent.

### 2. Deliberate indifference

To show that prison officials were deliberately indifferent to an objectively serious risk, the officials must have "(1) subjectively known the prisoner was at substantial risk of committing suicide and (2) intentionally disregarded that risk." *Collins,* 462 F.3d at 761. Specifically, in suicide cases, the plaintiff must show "that prison staff (1) knew of a significant likelihood that he would imminently attempt suicide and (2) failed to take reasonable steps to prevent his attempt." *Davis-Clair v. Turck*, 714 Fed.Appx. 605, 606 (E.D. Wis. 2018) (citing *Estate of Miller,* 608 F.3d at 989-90; *Sanville*, 266 F.3d at 737). The prison official "must be cognizant to the significant likelihood that an inmate may imminently seek to take his own life." *Collins,* 462 F.3d at 761.

A reasonable jury could not conclude that Dr. Rubin-Asch and the correctional officers were deliberately indifferent to Conner on April 20, 2017. Dr. Rubin-Asch, in his professional medical opinion, determined that Conner's threats of self-harm "were not serious and were motivated solely to obtain secondary gain, including remaining in observation." ECF No. 57 at ¶ 67. This opinion was based off of his review of

Conner's history and his observation of Conner. *Id*. at ¶ 68, Dr. Rubin-Asch reasoned that taking him off observation would improve his mental health or at minimum get him to cooperate with PSU. ECF No. 26-1 at Exh. 34.

Deference is "owed to the professional judgment of medical personnel." *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016). "By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id*. If the defendant medical professional claims to have based his treatment decision on professional judgment, he is then "effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment." *Id*. A medical professional would not be entitled to summary judgment only where the treatment decision is "so far afield of accepted professional standards as to raise the inference that [they were] not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008). A plaintiff merely disagreeing with a medical professional's judgment or course of treatment is not enough to overcome summary judgment. *Stallings v. Liping Zhang,* 607 Fed. Appx. 591, 593 (7th Cir. 2015).

Conner does not dispute Dr. Rubin-Asch's reasoning for taking him off observation status. ECF No. 67 at ¶ 64. Nor does Conner take issue with Dr. Rubin-Asch's statement that he had not exhibited suicidal ideations in the recent past, noting that Dr. Rubin-Asch was aware of the threat Conner made to Godfrey. ECF No. 26-1 at Exh. 34. The heart of the issue here, though, is whether Conner's

threats/suicidal ideations were sincere. Dr. Rubin-Asch had decided they were not—and this included the threat made to Godfrey. Conner presents no evidence to discredit Dr. Rubin-Asch's determination that Conner's attempts at self-harm were anything other than superficial. In fact, as noted above, the record contains no less than six examples of superficial attempts in a two-month period.

At best, Conner invokes his relationship with "John" as evidence that he may have serious underlying mental issues. But on April 20, it is undisputed that Dr. Rubin-Asch was not aware of "John." ECF No. 67 at ¶ 88. In Dr. Rubin-Asch's professional judgment, he determined Conner was not a genuine suicide risk, and a prison official cannot be held liable under the Eighth Amendment where he was "not alerted to the likelihood that [the prisoner] was a genuine suicide risk." *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484, 488 (7th Cir. 2001). As such, Dr. Rubin-Asch is entitled to summary judgment on Conner's Eighth Amendment claim.

The defendant correctional officers also were not alerted to the likelihood that Conner was a genuine suicide risk. Dr. Rubin-Asch determined that because Conner had not exhibited genuine suicidal ideations, he could be removed from observation status. ECF. No. 26-1 at Exh. 34. The defendant correctional officers are entitled to rely upon Dr. Rubin-Asch's professional determination. *See McGee v. Adams*, 721 F.3d 474, 483 (7th Cir. 2013) (non-medical personnel are "entitled to rely upon the medical professional's determination" of the best courses of treatment and any related conditions of confinement.)

In Conner's view, Conner made subsequent threats of suicide during the extraction and after it occurred, and he contends the defendant officers were deliberately indifferent to those threats. ECF No. 67 at ¶ 74. The defendant officers dispute that Conner made additional threats. *Id.* However, this factual dispute is immaterial. Any subsequent threat Conner may have made to the defendant officers were merely reiterations of his earlier threat. That threat had already been discredited by Dr. Rubin-Asch, who determined that Conner's threats were not genuine. Thus, the defendant officers, in relying on Dr. Rubin-Asch's determination, could not be aware of a likelihood that Conner would genuinely attempt to commit suicide.

Even if the defendant officers did not know Dr. Rubin-Asch's specific determination regarding the credibility of Conner's suicide threat, they were aware that Dr. Rubin-Asch determined that Conner no longer needed to be on observation status. After all, this is the reason they were extracting Conner from his cell. Pursuant to DAI policy, the defendant correctional officers could not override Dr. Rubin-Asch's determination that Conner no longer needed to be on observation status unless circumstances arose where they needed to ensure the safety of the inmate. ECF No. 57 at ¶ 28; ECF No. 59-2. And this protocol was followed because as soon as it appeared Conner was attempting to hang himself, correctional officers intervened and placed him back in observation status. ECF No. 67 at ¶¶ 78-84. So, even if they were aware of a genuine threat of suicide, the response to it was reasonable. Accordingly, no reasonable fact finder could conclude that the defendant officers were

deliberately indifferent. *See Davis-Clair*, 714 Fed.Appx. at 607 ("An official who responds reasonably to a risk of harm is not deliberately indifferent to it.") As such, the defendant officers are entitled to summary judgment on Conner's Eighth Amendment claim as well.

## B. First Amendment retaliation claim

Conner claims that Dr. Rubin-Asch removed him from clinical observation status in retaliation for refusing to talk with or cooperate with PSU staff. For the purposes of summary judgment, the plaintiff has the initial burden to make out a *prima facie* case of retaliation by showing that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation likely to deter such activity; and (3) the First Amendment activity was at least a motivating factor in the decision to impose the deprivation." *Hawkins v. Mitchell*, 756 F.3d 983, 996 (7th Cir. 2014). Conner meets the first prong, because refusing to speak is encompassed in the First Amendment's guarantee to freedom of thought. *See Wooley v. Maynard*, 430 U.S. 705, 714 (1977). Regarding the second prong, observation status serves the purpose of ensuring "the inmate's safety and the safety of others if the inmate is mentally ill and dangerous, is dangerous to himself or herself, [and] has a medical problem that requires separation from the population for treatment. . . ." Wis. Admin. Code § DOC 311.01. Observation status, then, is a component of medical care of an inmate, and "deprivation of medical care is enough to deter protected activity when combined with retaliatory animus." *Smego v. Payne*, 469 Fed. Appx. 470, 475 (7th Cir. 2012). Conner also meets the third prong because by Dr. Rubin-Asch's own admission, Conner's

"reluctance on his part to discuss behavior health concerns with PSU staff members" was one of the reasons he removed him from observation status. ECF No. 26-1 at Exh. 34.

If a plaintiff makes a *prima facie* showing, the burden shifts to defendants to show that the adverse action would have happened even in the absence of the protected speech. *Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012). After several weeks of Conner not cooperating with PSU staff, Dr. Rubin-Asch formed a professional opinion that Conner refused to cooperate with PSU in order to remain on observation status—which Conner viewed to be an advantage. ECF No. 57 at ¶ 68. Dr. Rubin-Asch also determined—based on what information he had on Conner— that there was no evidence of a medical problem requiring him to separate Conner from the rest of the population in order to treat that problem. ECF No. 26-1 at Exh. 34. In other words, Dr. Rubin-Asch determined that there was no justification to keep Conner on observation status indefinitely. *Id.* Had Conner cooperated, Dr. Rubin-Asch would have had more information into Conner's mental state, and perhaps that would have changed his determination. But it certainly does not hold that but-for Conner's refusal to speak, Dr. Rubin-Asch would have let him remain on observation status. Accordingly, Dr. Rubin-Asch meets this burden.

The burden then shifts back to Conner "to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Thayer*, 705 F.3d at 252. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered

reason is a lie." *Zellner v. Herrick*, 639 F.3d 371, 379 (7th Cir. 2011). Conner has not met this burden. Conner offers no evidence contradicting Dr. Rubin-Asch's stated reason that, in his professional opinion, he did not believe Conner's threats of self-harm were genuine and, therefore, there was not enough evidence to justify keeping Conner under observation status indefinitely. Conner simply attacks Dr. Rubin-Asch's decision to remove him from observation status, not his reasoning behind it. ECF No. 67 at ¶¶ 64-67. As such, no reasonable factfinder could conclude that Dr. Rubin-Asch's reason for removing Conner from observation was a lie. Thus, summary judgment is granted in factor of Dr. Rubin-Asch on Conner's First Amendment claim.

## V. Motion for Spoliation Sanctions

Conner filed a motion for sanctions related to defendants' failure to preserve the video of his cell extraction on April 20, 2017 taken around 3:00 p.m. ECF No. 28. Under Federal Rule of Civil Procedure 37 (e), parties have a duty to preserve electronically stored information in anticipation of litigation. This duty does not arise until litigation is imminent. *See Norman-Nunnery v. Madison Area Technical College*, 635 F.3d 422 (7th Cir. 2010); *Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672 (7th Cir. 2000). Defendants received notice of this lawsuit on March 30, 2018, when they received notification through the informal service agreement between this court and the Wisconsin Department of Justice. ECF No. 34 at 9. Defendants state that the video was inadvertently deleted in the normal course of business prior to being aware of the lawsuit. *Id.* at 5. Conner has presented no evidence that it was intentionally

destroyed "with intent to deprive" him of the information on the video. Fed. R. Civ. P. 37 (e)(2).

Because the court cannot find that the defendants intended to deprive Conner of the video, the court can only act where it finds that the lack of the video prejudices Conner. Fed. R. Civ. P. 37 (e)(1). Conner states that this video is important because it "supports his claims that he was in fact informing the defendants that he was feeling suicidal and making threats of self-harm." ECF No. 29 at 9. As discussed above, whether Conner made the threats to the officers extracting him from the cell is immaterial. Thus, Conner is not prejudiced by the lack of the video. Accordingly, his motion for sanctions is denied.

**THEREFORE, IT IS ORDERED** that Conner's motion for leave to file a sur-reply (ECF no. 70) is **DENIED.**

**IT IS FURTHER ORDERED** that Conner's motion for summary judgment (ECF No. 24) is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (ECF No. 47) is **GRANTED.**

**IT IS FURTHER ORDERED** that Conner's motion for spoliation sanctions (ECF No. 28) is **DENIED.**

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this

court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.


Dated in Milwaukee, Wisconsin, this 27th day of March, 2019.

**BY THE COURT:**


*s/ David E. Jones*

DAVID E. JONES
United States Magistrate Judge